This case is the CFTC v. Dacorta. When the lenders loaned money to OASIS through the loan agreement documents, the promissory agreements, which all of the lenders signed, they were immediately divested of their ownership interests in those funds. That divestiture of ownership interests had five important legal consequences. First, OASIS was no longer trading commodities for or on behalf of any other person, which is a requirement for a violation of Commodities Exchange Act Section 4B. OASIS... Did you raise that issue in your briefing on summary judgment before?  The CFTC claims that it wasn't raised. I retorted in my reply brief, pages one through three of my reply brief, Mr. Dacorta raised this nine times. On nine separate occasions. In the motion to dismiss, did you raise it in the briefing at summary judgment? Absolutely. While the citations are in my reply brief, pages one through three, Mr. Dacorta raised this issue specifically nine separate times. In your opposition to the CFTC summary judgment motion, you argued that neither Mr. Dacorta nor the OASIS funds traded for any individual resident of the United States in any capacity. Are you pointing to that single statement that was made in connection with a different issue regarding whether they were commodity pools? No, there were nine separate times that he raised this issue, Your Honor. There were nine separate occasions. They're all cited in my reply brief, pages one through three. So that was the first legal consequence of the signing of those loan agreements and promissory notes, that they were divestitive ownership interests and therefore OASIS was not trading commodities for or on behalf of any other person. They were trading their own money for their own accounts. The second legal consequence was that the lenders were not sharing in the profits or losses of commodities trades, which is a necessary element for the existence of a commodity pool, which is a very important point in this case. Is that what the statute says? I'm sorry, Your Honor? Where do you get that language? Because the statute certainly doesn't have that requirement. It's from the case law. It's from all the cases. It's not from the case law in this circuit, correct? In this circuit, in the seminal case on this issue over the existence of a commodity pool is Lopez versus Dean Witter, and certainly the case CFTC versus Ammerman, which is the seminal case in this circuit. On this circuit, you have Ammerman, but did that case have the opportunity to even review whether or not the funds being shared were distributed in a paraded fashion? Was that even an issue? Yes. Of course. There were four separate, in both Lopez versus Dean Witter and in CFTC versus Ammerman, they said for the existence of the commodity pool, there are four, Dean Witter, Lopez said there were four elements, Ammerman said there were three. My question is whether or not that issue, whether that was an issue in Ammerman. Yes. They found, they specifically found that the existence of a commodity pool had, there had to be four separate, well, in Ammerman it was three separate things. Let me try again. I understand that the decision says that. My question to you is whether or not the facts in that case caused the court to consider whether or not that was a necessary element of a commodity pool. Yes. It was the holding of that court. The court specifically said the sine qua non of the existence of a commodity pool requires the pooling of the investor funds, the sharing of profits, profits and losses on a prorated basis by the investors, and the pooling had to be for the purpose of limiting the liability of the investors. Ammerman is not a published case. It's a federal appendix case. Yes. It is an unpublished 11th circuit case that is not binding.  And if it follows the, that's why I cited the Lopez versus Dean Witter case. That seems to be the seminal case on the existence of a commodity pool. Also not binding on this court. It's not binding, but it's the seminal case throughout the United States, Your Honor. There's not a unanimity as far as that goes either. I mean, that is one position on the law, but there is another position on the law as well. And the other position is that there's no statutory text that supports the requirement of prorata shares, prorata funding. The statutory text is very simple and the regulatory text follows the statutory text. The lower court here in this case held that the pooling, merely the pooling of funds was necessary to find that there existed a commodity pool in Oasis. Statutory text does not contain that either. So all of the cases that considered this issue of whether or the existence of a commodity pool usually refer to the Lopez versus Dean Witter case, as did the Ammerman case, Your  Honor. The district court cited CFTC versus Collins in saying the loan agreements, the existence of the loan agreements and the risk assessment agreements didn't really matter as to whether or not the Oasis could be classified as a commodity pool. They said the district court held the mere pooling of funds. That language is not in the statute either. That's not in the statute. But the case law interprets it that way. All the case law interprets it that way. When you look at the statutory language, which is it defines commodity pool as, quote, any investment trust, syndicate or similar form of enterprise operated for the purpose of trading in commodity interests, you know, a trust syndicate or similar form of enterprise connotes that there's going to be some kind of pooling of interests. Does it not by its language? Not necessarily. I mean, all the cases interpret it that way. All the cases . . . There's a reason why though, right? I mean, it is the sort of . . . The sine qua non, Your Honor, as the Ammerman case held. It is the meaning . . . when you look at what these words mean, that is one of the things you come away with, right? That even though they might not use the term pooling of interests, which of course makes sense because they're defining the term commodity pool, that when you look at what they're talking about, investment trust, syndicate or similar form of enterprise operated for the purpose of trading in commodity interests, that they're talking about the pooling of interests. So it is the natural implication of that language, isn't it? Yeah. Judge, and I think . . . I mean, is it or isn't it? What is your position on that? Yes. Okay. I think the natural implication of the existence of the commodity pool is to invite investors in to invest in this. Pooling of funds, sharing of profits, and limiting their liability, the allure of the commodity pool is for investors to limit their liability. That is the upside. They're limiting their liability. The downside is . . . This is what courts have recognized uniformly. And if you look at page . . . Not all courts have recognized it. If you look at page majority, the majority of courts, if you look at page nine of my reply brief, I listed the majority of courts throughout the United States in the circuits that say, listen, the commodity pool, the allure of the commodity pool is the sharing of profits on a . . . it's limiting their liability, the sharing of profits on a pro rata basis. The Seventh Circuit has not adopted that. Has it? The Seventh Circuit? Correct. I don't know what the Seventh Circuit has adopted, Your Honor. No, the Seventh Circuit . . . But what I . . . I mean, if you're going to say that all the courts have said this, I think you should  The majority have. The majority have. Well, the Seventh Circuit in Rosenthal and Company versus Commodity Futures Trading Commission has said a commodity pool is the commodity futures equivalent of a mutual fund. The investor buys shares in the pool, and the operator of the pool invests the proceeds in commodity futures. They did not . . . and then in United States versus Wilkinson, also from the Seventh Circuit, it explained that, quote, actual trading of futures is not required, unquote. I want to address those two statements, Your Honor. Investors invest for the purpose of profiting, of sharing in the profits. And this is . . . I want to get back to the legal consequences of these documents, because it was never fully explored by the lower court that the lenders, in this case, were not sharing in profits. People who invest in commodity pools intend to share in profits. That is the allure of the commodity pool. It limits their liability, and they share in profits. Because of these legal documents, the promissory notes and the loan agreements, they divested their ownership interests. They fully relinquished all rights to those funds to OASIS. So OASIS was not pooling funds on their behalf, and it was not trading funds. It was not trading in commodities on their behalf. That is, trading commodities on their behalf is a necessary part of the existence of a commodity pool. Inherently, inherently, Your Honor, where there does not exist a commodity pool, there cannot be a commodity pool operator or an associated person of a commodity pool operator. These lenders knew, by evidence of all these documents, these lenders knew they were not entering into commodities transactions. They knew that no one was entering into commodities transactions on their behalf. They were going to be paid in principal and interest or transaction fees. And they knew they were not going to be sharing in profits or losses on a pro rata basis, which many of the courts hold. In fact, the seminal case, I think many courts recognize that the Lopez versus Dean Witter is a seminal case with regards to the finding of the existence of a commodity pool, Your Honor. One of the other arguments raised for the first time on appeal was the agency argument by the CFTC. They argued that OASIS was the agent of these lenders, and therefore, they can still be I cited to a case, CFTC versus Gibraltar, Gibraltar Monetary. That said, the important part of the agency relationship is the continuous control over the agent by the principal. In this analogy, the lenders would have been the principals and OASIS the agent. That didn't happen in this case. OASIS was not continuously controlled by the lenders. In fact, the language of the lending agreement specifically said that they relinquish all control over those funds, and OASIS could invest in whatever it wanted to. And in fact, did. They invested in real estate. They invested in startup companies. They invested in precious metals and commodities as well. Your Honor, the legal effect, the thrust of my brief is that the legal effect of these by the lower court, and that should have prevented the granting of summary judgment. Let me ask you a question about the eligible contract participant. Yes. You seem to be saying the reason you're arguing ECP is because we should only be looking to OASIS itself and not any of the people who have the promissory notes. If we agree with the district court that we must look to the investors, do you concede that you would lose the ECP? Your Honor, first, I just respectfully, I want to disagree with the premise of Your Honor's question. There were no investors here. There were lenders. What I'm saying is if we disagree with that and we think that there are investors, do you lose the ECP? No. Here's why. Under the statute, Title VII, Section 1, lowercase a, subsection 18, subcapital A, there are 11 different ways one can be an eligible contract participant. The district court considered one of those ways. The district court considered 1, lowercase a, subsection 18, subcapital A, Roman numeral four. Mr. Decorda argued that he was an eligible contract participant under 1, here we go, 1, lowercase a, 18, subcapital A, sub-Roman numeral five. The content of sub-Roman numeral five is you are a corporation that trades in commodities. You have a net worth in excess of a million dollars and you trade for your own account. He fulfilled all the criteria for that ECP. My question is premised on if we find that we would be looking to all investors, like that you're losing, that these are not lenders, that they are in fact investors, we're going to be looking at their net worth and we know that some of those folks are below that net worth requirement, so aren't you going to lose ECP? No, because that's only under 1, lowercase a, 18, capital A, sub four, sub-Roman numeral four. That is one of 11 ways that one can be an eligible contract participant. I'm saying the next Roman numeral, the next way, the fifth way, is he fulfills all that criteria for an eligible contract participant and that was never considered by the lower court and that should have prevented the granting of summary judgment. Even if we think that this is a commodity pool with investors, you're saying there's a circumstance under which we only look to him? No, the Oasis entities in general had a net worth. Even if we say, even if we disagree with you and hold that all of these lenders are also investors? And if you disagree that the loan agreement documents and the promissory notes and the They are all participants in the commodities pool. Although, I'm not sure . . . There were no direct trades made with any of the lenders. None of them. None of them participated directly in the trading of commodities. If we think that these are investors and a commodities pool, if we agree with the district court, do you lose ECP? No, because of sub-five. 1, a, 18, capital A, sub-five. It fulfills that criteria. Thank you. Thank you, Mr. Preziosi. You've reserved two minutes for rebuttal. Thank you. And we'll hear next from, is it Ms. Eisenbrae? Eisenbrae. Eisenbrae. I apologize. Thank you for the pronunciation. May it please the court, Margaret Eisenbrae for the Commodity Futures Trading Commission. The CEA is a remedial statute construed broadly by this court. Congress gave us a broad and functional definition to apply to commodity pool operators. And it asks whether the person is in the business that is the nature of a commodity pool, investment trust, syndicate, or other form of enterprise, or similar form of enterprise. The court called his investments promissory notes, but the reality is these were investments. So just to be clear, I'm understanding that you have sort of an argument and an alternate argument. The first one is that you don't have to show that there were pro rata distributions. And the second one is even if you do, this was effectively that. It's just dressed up in different clothing. That's right. That's right. And I want to address something my opposing counsel said. He said the lenders were not sharing in the profits or losses. But there was a guaranteed percentage. And then it was 25% of the transaction fee, which the promissory note explained was generated through the proprietary trading account. These were his Forex supposed profits. Now, they weren't real profits. He never was a profitable trader. And then he sent emails to his pool participants, or lenders if you will, telling them, hey, this month I got 2.3%. Why would he be telling them I got 2.3%? Why would their notes on the promissory note, if you want to call them that, I think this is still a pool, tell them that, oh, we're getting a certain percentage of profits based on Mr. Decorda's trading. So they are sharing in the profits based on his trading. That's all we need. The promissory note here was also accompanied by risk disclosures that made it clear that this was an investment. It discussed how you must carefully consider your investment objectives and do not invest money. You're not in a position to lose. That's at Appendix 9-154. And then it specifically allowed the lender or pool participant to receive account statements. And they were allowed to generate daily, monthly, and annual account statements detailing transaction activity and profit and loss statements. And as I said before, Mr. Decorda was sending emails to the school to tell them, hey, this is how we're doing. Mr. Decorda is here today because he's a recidivist and he wanted to avoid the CFTC's jurisdiction. To that end, he just adjusted the form of this fraud in the last year of the fraud from a managed account scheme to a promissory note scheme. That adjustment did not sever CFTC jurisdiction over his solicitations for the purpose of trading in CFTC-regulated markets. It did not sever CFTC jurisdiction over his lies about his trading in CFTC-regulated markets. And it did not sever CFTC jurisdiction over the theft of funds given to him for the purpose of trading in these markets. Here, Appellant masterminded a scheme which solicited over $75 million for more than 700 people for the purpose of trading Forex. He pooled their money and traded commodity interests. And the victims would have understood that this was an investment. He downplayed the importance of the promissory notes, telling both Patty Catter and the undercover FBI agent, this is just something that the lawyers require. Don't worry about it. Then the promissory notes talked about the lenders' funds as an investment, talked about their investment objectives specifically. If you look at appendix 9 at 154, you'll see that. He sent his reported returns based on his fictitious trading. That includes saying, hey, I didn't do a lot of trading while I'm in Italy, but hey, we're up .63% everyone. He continued to aggregate the customer funds all into a single account to trade the money. And then he even called it a pool in some of his solicitations. In his solicitation to the undercover FBI agent, he said, you're involved in every single trade I do all the time, regardless of how much money we have in the entire pool. Well, there really isn't any dispute that all the money, right, went into one fund and that whatever trades there were came out of that fund, right? I don't even think that's in dispute. From the record, as I see it, there's no dispute about that. The issue is whether or not that loan structure somehow takes you out of the investment tool altogether. Can you just specifically address why the loan structure of it does not do that? Right. So for one thing, this is just a guaranteed percentage. He's structured it as a loan. But this is still the nature of a commodity pool investment trust syndicate or otherwise because it is a broad remedial statute and Congress gave us this definition that a commodity pool operator is just someone that's in the business of that nature. And whether he calls it a promissory note or he calls it a pool document, it is still the nature of that in that they're sharing in the profits, they're getting their statements, he's soliciting it as an investment, and a reasonable investor would have understood what they were doing is investing with him. And so for those reasons, we think that it still counts. Counsel, can I ask you about a published decision from this court that neither party cited to? SECV, Unique Financial Concepts, Inc. It's one of our cases from 1999, and it seems to at least partially address the question of the factors that define a commodity pool. We said the following. The district court explicitly found that the investor's funds were to be pooled and distributed on a pro rata basis for the alleged purpose of trading commodity interest. Appellants thus were offering an investment opportunity in a commodity pool. What should we, you know, it's worded in a way I think you could say, well, maybe it supports the three factors, the pro rata, maybe it was just that happened to be the structure of the funded issue, and so it was, the district court was merely listing the things that, the factors of that fund. How are we supposed to read that case? I think pro rata is the normal way a commodity pool trades, but that doesn't mean it's the only way a commodity pool trades. I think I cited in our brief about how we have registered commodity pools that don't trade on a pro rata basis. So for that reason, I would argue that a pro rata is not a requirement. I just might have been a feature. It may have been a feature. And in unique, it never actually specified whether it was saying it was a requirement, right? Right. Moreover, appellant's waived argument regarding the four on behalf of requirement should not be entertained. It relies on reading one narrow portion of the promissory note to the exclusion of the remainder of the agreement, the exclusion of the solicitations made to victims, as well as ignoring the emails announcing Decorda's fictitious trading results. Finally, his assertion without any factual support that Oasis Pools should be evaluated under the definition of an ACP that applies to a business of a net worth of more than $1 million may be disregarded. Mr. Decorda did not and cannot show that the pools had a net worth of more than $1 million as required by the definition. For these reasons... Let me go back to the question I was asking opposing counsel. If we agree with the CFTC and if all of these lenders, the note holders, are, if we agree that they should be treated as investors in the commodity pool, he's going to lose the ACP issue, right? That's correct. He says he wouldn't lose because that's not the only way that you could be an ACP. What do you say in response to that? I have two arguments in response. One is where the statute says commodity pool and then has a definition, and we've decided something is a commodity pool, it should follow under that definition. It shouldn't follow under the definition of a business. My second reason is he can't show that he had a net worth of $1 million in the first place. The district court noted that when the commission brought this lawsuit, the OASIS victims were owed over $120 million, and the OASIS entities had a net worth of less than $10 million in  A net worth does mean accounts receivable, accounts payable. You've got to net it out. They were in the red. He cannot get there with the $1 million regardless, but also because a commodity pool must meet the definition that Congress gave us for an ACP that is a commodity pool. In short, this court should reject the court's arguments and recognize that the loans here were investments, and for the reasons stated today and in the CFTC's brief, if there are no other questions, the commission requests that the court affirm. Thank you, Ms. Azenbury. And Mr. Prezios, you have reserved two minutes. Yes, Your Honor. Distilling my arguments, the effect of the loan agreements were never fully explored. Those were genuine issues of material fact. Whether or not they completely divested the ownership rights and control rights of these lenders should have been further explored. The only place the lower court explored this was at page 18, and it said the loan agreements can be completely disregarded with regards to the existence of a commodity pool. Genuine issue of material fact. What was the legal effect of those documents? It should have prevented summary judgment. I just want to address one other thing. I think maybe you should also address the point that your friend on the other side has raised, which is your client was treating them as investments, as pro rata. We made this amount. He's reporting to the investors. We made this percentage this month, and there are transaction fees that we get based on how they do. I mean, wouldn't we be elevating form over substance if we accepted your argument? No. Why not? The lenders were paid in principle and interest, if and only if the return rate was 12 percent per year. If and only if the transaction fees generated by those commodities transactions exceeded 12 percent were they paid any part of that. That is not profiting from the fluctuations in the market based on commodities trading. That's just merely a brokerage fee. That's not a profit. Profit insinuates and means something very different than receiving brokerage fees or transaction fees. They're not the same. That's not being subject to the fluctuations of the market. Taking in profits on a pro rata basis means you're subject to the fluctuations of the market, and if it goes up, you profit. This is a transaction fees. Whether they made money or lost money, they gained it like a broker. They gained a transaction fees, and one thing that was not stated was that Oasis generated over $53 million in transaction fees, and it shared those fees, not profits or losses. Again, the net worth of whether or not he is an eligible contract participant is a genuine issue of material fact that was never explored by the lower court. That should have prevented the granting of summary judgment. All right. Thank you very much. We appreciate the arguments, and we are adjourned for the week.